20281

Sam MOSS et al., Respondents, v. AETNA LIFE INSURANCE
COMPANY, Appellant.

(228 S. E. (2d) 108)

*Messrs. Love, Thornton, Arnold & Thomason,* of Green-ville, *for Appellant,*

*Messrs. Anderson, Kenyon & Epps,* of Anderson, *for Respondent,*

September 9, 1976.

LEWIS, Chief Justice.

The issue for determination is whether the employment of respondents by the Independent Publishing Company of Anderson, South Carolina, was terminated within the meaning of the provisions of a group policy of insurance issued by appellant, so as to entitle respondents to collect the cash surrender value of certificates of insurance held by them under the group policy. Both plaintiffs-respondents and defendant-appellant moved for summary judgment and this appeal is from the order of the lower court granting the motion of respondents. There were no genuine issues as to

any material fact and summary judgment in favor of either respondents or appellant was proper, depending upon the legal conclusions to be drawn from the undisputed facts.

Appellant issued a group life insurance policy to the Independent Publishing Company of Anderson (Independent) on May 1, 1967. Respondents are employees of Independent and hold certificates of coverage under the group policy. The policy provided that, upon "termination of employment" with the employer (Independent), the employees (respondents) would have the option to take paid-up insurance or the cash surrender value thereof.

Respondents were employees of Independent on March 1, 1974 and covered under the group policy. On that date they were issued written termination notices by Independent, stating that the "named employee is officially terminated on March 1, 1974 from the Independent Publishing Co." Each respondent then executed a document exercising their option under the group policy by electing to receive the cash value. Thereafter, all of the respondents were "reemployed" on the same date. It is undisputed that the "termination of employment" of respondents involved a work stoppage of only five (5) minutes, with no loss of pay, and was a "formality" undertaken for the sole purpose of assisting respondents in obtaining the cash value of the policy (about $20,000.00).

The lower court held that the cessation of work for five minutes was a "termination of employment" within the meaning of the policy. We disagree and reverse.

The pertinent portions of the applicable policy provisions are as follows:

## "SECTION IV.

"A. *Definition of Termination of Employment.*

Cessation of active work with the Employer shall be deemed termination of employment for the purposes of this policy, except that if an employee is temporarily laid off or

is granted a leave of absence . . . or is absent on account of sickness or injury, employment shall be deemed to continue during such lay-off or absence, . . . .

"SECTION XV.

"B. *Determination by Employer.*

The determination and findings by the Employer with respect to the fact and time of commencement, duration, and termination of employment of any employee, with respect to the fact and time of commencement, duration, and termination of any lay-off, leave of absence, . . . , and with respect to the earnings or salary of any employee, shall be conclusive and binding upon all persons for the purposes of this policy."

The employer (Independent) notified respondents that their employment was "terminated" on March 1, 1974, and then "reemployed" them five minutes later. The lower court construed this action as a determination by the employer that the employment of respondents had been terminated and that such determination, under the quoted provisions of Section XV(B) of the policy, was binding on all parties. We do not think that the actions of the employer in this case can be properly given the conclusive effect accorded by the lower court.

The discretion placed in the employer to determine whether an employee is terminated cannot be arbitrarily exercised with total disregard of the policy definition of "termination of employment." The phrase "termination of employment" is defined in Section IV of the policy as the "cessation of active work with the employer" but, "if an employee is temporarily laid off or is granted a leave of absence . . . employment shall be deemed to continue during such lay-off or absence."

These policy provisions "mean a complete severance of the relationship of employer and employee, of which the

employee has knowledge, by positive act on the part of either or both." *Waltz v. The Equitable Assurance Society of the United States,* 233 S. C. 210, 104 S. E. (2d) 384.

Under the policy definition, there must be a cessation of active work to constitute a "termination of employment," but not every cessation of active work constitutes a termination. The definition specifically states that, "if an employee is temporarily laid off or is granted a leave of absence" the employment shall not be regarded as terminated.

The fact that the employer may designate a work stoppage as a "termination of employment" cannot make it a complete severance of the relationship of employer and employee in the face of the undisputed facts to the contrary.

The evidence conclusively shows that the work stoppage, here relied upon and characterized as a termination of employment, was in fact a temporary layoff for five minutes with employment continuing during that period. The following testimony of the production manager of Independent is undisputed and shows the continuing relationship of employer and employee:

"Q. You were supposedly terminated on March 1st, 1974 and who re-hired you?

"A. We were told—the Department heads were told . . . to terminate them for a period of approximately five minutes.

"Q. And then you would automatically be re-hired or reinstated?

"A. Yes, sir.

"Q. Well, did you have to tell each employee under you in the Production Department that he had been re-employed or was it understood?

"A. Called them together and told them they were automatically terminated for a period of five minutes, stood there

and talked to them for that period and then told them that they were reinstated.

"Q. And when you terminated them for that five minutes you knew at the time you terminated them that they would be re-employed?
"A. That is correct.

"Q. It followed automatically, so to speak?
"A. Yes, sir."

The record shows that the employees did not leave their place of work; there was no loss of pay; and the employer and employees knew and understood that work as usual would resume at the end of the five minute period. The work stoppage was nothing more than a temporary interruption from work, with an intention of continuing the employer-employee relationship. Such does not constitute a termination of employment within the meaning of the present policy provisions.

The order of the lower court also noted "that there are authorities to the effect that upon the sale of the business or any part thereof there is a termination of employment within the meaning of the 'termination of employment'" clause. It is not clear whether the decision of the trial judge was also based upon this additional ground. In any event, there is no factual basis to support the conclusion that there had been a sale of the business.

The only reference in the record to the issue concerning the sale of the business is found in the order under appeal where it is stated:

"The court was asked to take judicial notice that on February 4, 1974 Wilton E. Hall sold all of his stock of Independent Publishing Company to Harte-Hanks Newspapers, Inc., San Antonio, Texas. The court takes judicial notice of such sale as plaintiff moved to amend the pleadings to reflect such fact and such amendment was orally granted."

There is no evidence in this record to support the finding that there was a sale of the stock of Independent other than the "judicial notice" of the alleged sale. The basic issue in this matter was whether there had been a termination of employment. The effect of the action of the lower court was to find that there had been a termination of employment through a sale of stock in the company, based solely on judicial notice of the alleged sale.

"Judicial notice" takes the place of proof. It simply means that the court will admit into evidence and consider, without proof of the facts, matters of common and general knowledge. *State v. Broad River Power Co.,* 177 S. C. 240, 181 S. E. 41; 31 C. J. S., Evidence, §§ 6 and 9. "The test is whether sufficient notoriety attaches to the fact involved as to make it proper to assume its existence without proof." 29 Am. Jur. (2d), Evidence, Sections 22 and 23. Wigmore on Evidence, (3d) Ed., Section 2567.

Ordinarily, the internal affairs and transactions of a private corporation are not a proper subject for judicial notice. *State v. Martel,* 122 Vt. 491, 177 A. (2d) 236.

Here, the lower court took judicial notice of the private sale by Mr. Hall of all of his stock in the private corporation (Independent) on February 4, 1974. These facts could only be ascertained from the records of the corporation or from someone having personal knowledge of the transaction. They were not of such common knowledge that the court could assume their occurrence without proof and, therefore, not the subject for judicial notice.

The judgment is accordingly reversed and the cause remanded for entry of judgment in favor of appellant.

LITTLEJOHN, NESS, RHODES and GREGORY, JJ., concur.